Dtjreee, Judge,
delivered the opinion of the court:
In this action plaintiff seeks to recover $16,390.01 in consequence of a General Accounting Office decision that the rates for transportation of Conex Cargo Transporters by plaintiff, as well as other common carriers, for defendant’s account during 1956 and until May 10,1957, should have been accounted for at the rate applicable to “sheet iron or steel boxes, noibn [i.e. not otherwise indexed by name] liquid capacity exceeding 15 gallons.” Plaintiff, as delivering carrier, had billed the Government and had been paid at the rate applicable to “vans, lift or other than lift.” After the General Accounting Office decision, the Government recov *613 ered the difference through deductions of amounts justly owing to plaintiff for other services. Plaintiff brings this action to recover the amounts so deducted.
The “boxes noibn” classification which the Government contends controls, Item 13785 of Uniform Freight Classification No. 3 (hereinafter referred to as Item 13785), reads a} follows:
* * * * *
13785 CONTAINERS, SHEET IRON OR STEEL, SET UP (WITH OR WITHOUT THEIR EQUIPMENT OF BAILS, HANDLES, COVERS, BUNGS OR NOZZLES), see Note 1, Item 13830:
13790 Barrels, drums or kegs, noibn, shipping, * * *; Bowes, noibn;
Cans or boxes, cracker, including those made partly of glass, * * *;
Cans, oil or tank wagon;
Cans, shop (shop kegs or shop barrels);
Cans, noibn, including jacketed cans, * * *;
Drums, kegs or pails, white lead;
Drums, kits or pails, putty;
Pails (buckets), noibn, not enameled;

* * % % *

13815 Liquid capacity exceeding 15 gallons: * * * (Emphasis added)
From the classification set out above it is apparent that Item 13875 could include these Conex Transporters only under the general classification of containers as boxes noibn or not otherwise indexed by name.
Plaintiff contends, on the other hand, that these containers are in fact otherwise indexed by name through tariff definition and usage under the lift van classification, carrying a higher rate, Item 9585 of Uniform Freight Classification No. 3 (hereinafter Item 9585), which reads as follows:
CARRIERS, SHIPPING
^ ❖
Vans, lift or other than lift, see Note 20, item 9586; SU, loose or in packages KD or folded, loose or in packages
Item 9586 Note 20. — Ratings also include pads or wrapping for packing.
*614 The rates for shipments subsequent to May 10, 1957, are not in issue because on that date a new classification was issued to deal specifically with shipments of Conex Transporters.
Conex Transporters are reusable steel containers with an average usable life of ten years, designed to facilitate shipments of freight and reduce pilferage. They are equipped with double doors opening to the entire width of one end to facilitate loading. These doors can be locked and sealed in a maimer similar to railway cars. They may be loaded by men or fork-lift trucks and may be carried on railroad cars as well as trucks. Originally Conex Transporters were designed for the carriage of household goods, but their use has been extended to all types of freight, mail, military supplies, etc. The use of Conex Transporters began in 1949, and they were put into full scale service with the military in 1952, when their designation as transporters for household goods was generalized to denote merely reusable steel shipping containers with specified capacities. Each of the approximately 65,000 Conex Transporters currently in service with the military bears a serial number, and the transporters are centrally controlled for all the military services by the Joint Conex Control Agency in Washington, which controls and dispatches use of the transporters in much the same manner employed by the railroads regarding railroad cars.
Beginning in 1954 the Army repeatedly sought a special classification for Conex Transporters from the Official Classification Committee. At that time, and until May 10,1957, when a specific classification was adopted, Conex Transporters were shipped subject to the rates established for lift vans under Item 9585. Until the ultimate adoption of the specific classification in 1957 the Classification Committee consistently upheld classification of Conex Transporters as lift vans. Moreover, in 1957 when the Committee provided a specific classification for Conex Transporters it recommended that the term “noibn” be added to Item 9585 in order to exclude from the “van” classification the specific type of “van” (i.e., Conex Transporters) for which the new classification provided.
*615 The lift van classification in Item 9585 has been in effect historically for quite some time. Originally it apparently dealt with demountable van (truck) bodies, but gradually encompassed containers in varying sizes and of types similar to the Conex Transporters. Indeed, an expert witness testified that when used for transportation of household goods Conex Transporters might properly be rated as “lift vans,” but when used for transportation of other freight should be classified as “boxes, noibn.” We think this argues against defendant’s position that containers of this type would not meet the generic concept of “vans.” Furthermore, the record indicates that prior to 1954 containers similar in qualities to Conex Transporters were consistently known and carried under rates determined by the “lift van” classification. Inasmuch as in industry usage containers of this type were historically deemed “lift vans,” and in view of the Classification Committee’s consistent position to the same effect, we must conclude that prior to the change in classification on May 10, 1957, these Conex Containers were properly ratable under the “lift van” classification. Consequently, the deductions were improperly made from sums justly owing to plaintiff for services rendered. Judgment will therefore be entered for plaintiff in the amount of $16,390.01.
It is so ordered.
Laramore, Judge; Whitaker, Judge, and Jones, Ohief Judge, concur.
Davis, Judge, took no part in the consideration and decision of this case.
FINDINGS OE EACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is an Illinois corporation. It is and was, during all times hereafter mentioned, a common carrier by railroad of persons and property in interstate and intrastate commerce.
2. This is a suit to recover amounts deducted from undisputed freight charges due the plaintiff on shipments other *616 wise unrelated to tbe present controversy. These amounts were deducted as a result of a General Accounting Office decision that transportation of Cones Cargo Transporters[1] by the plaintiff, in connection with other common carriers, for the defendant’s account during 1956 and before May 10 in 1957, should be paid for at the rate applicable to “sheet iron or steel boxes, noibn [not otherwise indexed Toy name] liquid capacity exceeding 15 gallons.” The plaintiff, as delivering carrier, had billed the defendant and was paid at the 'higher rate applicable to “vans, lift or other than lift.” The Government recovered the difference through deduction of amounts admittedly due for other services, and the plaintiff now seeks recovery of the amounts deducted.
3. The lift van classification, Item 9585 of Uniform Freight Classification No. 3, reads in pertinent part as follows:
CARRIERS, SHIPPING
* * # ❖ St
Vans, lift or other than lift, see Note 20, item 9586: SU, loose or in packages KD or folded, loose or in packages[2]
Item 9586 Note 20. — Ratings also include pads or wrapping for packing.
4. The boxes noibn classification of Uniform Freight Classification No. 3 (hereafter referred to as Item 13785) is as follows:
% * * * *
13785 CONTAINERS, SHEET IRON OR STEEL, SET UP (WITH OR WITHOUT THEIR EQUIPMENT OF BAILS, HANDLES, COVERS, BUNGS OR NOZZLES), see Note 1, item 13830:[3]
13790 Barrels, drums or kegs, noibn, shipping, * * *• Boxes, noibn;
Cans or boxes, cracker, including those made partly of glass, * * *;
Cans, oil or tank wagon;
*617 Cans, shop (shop kegs or shop barrels);
Cans, noibn, including jacketed cans, * * *;
Drums, kegs or pails, white lead;
Drums, kits or pails, putty;
Pails (buckets), noibn, not enameled:
i{s íji ¥ •!•
13815 Liquid capacity exceeding 15 gallons:
}J» i}4 j|i ¥
5. If plaintiff is correct, it is entitled to recover $16,390.01. If defendant is correct, plaintiff is entitled to recover nothing.
6. Plaintiff and other railroads have other claims on file with the General Accounting Office that will be affected by the outcome of this proceeding.
7. No action or suit has been commenced or is pending in any other court on account of these claims, and no action has been taken concerning them by Congress or by any of the executive departments or agencies except as described in these findings.
8. Plaintiff is the owner of the claims asserted, and no assignment or transfer has been made of the whole or any part of them or of any interest in them.
9. On May 10,1957, in circumstances described in findings 24 through 28, a new entry was added to the Classification reading substantially as follows:
CONTAINERS, SHEET IRON OR STEEL, SET UP (WITH OR WITHOUT THEIR EQUIPMENT OF BAILS, HANDLES, COVERS, BUNGS OR NOZZLES), * * *
Containers, commodity shipping, capacity 135 cubic feet or over, SU, loose or in packages 150 10,000R 85
Shipments of empty Conex Transporters made since then have been deemed to be subject to this new classification. No such shipments are involved in this case.

Description of Conex Transporters

10. Conex Transporters are reusable steel shipping containers. There are three types, differing primarily in size. Only those of the intermediate size, known as Type 2, are *618 involved in this case. They have tbe following physical specifications:
Overall: length, 8'6"; width, 6'3"; height, 6/10%'/.
Interior: length, 8T%"; width, 5Tl%"; height, Q'%".
Shipping cubage: 365 cu. ft.
Interior cubage: 295 cu. ft.
Tare weight: 1430-1500 lbs.
Maximum payload: 9000 lbs.
Gross weight: 10430-10500 lbs.
Access: access is by double door, across the width of one end, which provides a clear opening 5T*4" wide by 5'9%6" high.
Fittings: all transporters are fitted with skids and lifting eyes.
11. Conex Transporters are of rigid steel construction. They are designed to facilitate lifting and handling by all commonly used types of conventional materials-handling equipment of suitable capacity, such as fork-lift trucks, cranes, and ships’ tackle. They have no means of independent locomotion.
12. One Conex Transporter can be carried in an Army 6 by 6 truck. Three can be carried in the usual military or commercial flat-bed or open-top semitrailer. From six to eight can be carried on flat and gondola railway cars of the sizes commonly used in the United States. Empty Conex Transporters can be tiered two-high on flat cars for movement over routes affording sufficient clearance. They are suitably sized for economical movement by gondola and flat cars commonly used in foreign countries.
13. Conex Transporters are equipped with large double doors opening across the full width of one end for loading. The doors have a latch, a latch handle, and a handle stop. They may be secured by a lock or by a heavy gauge wire tie, binding the hatch handle to the handle stop. The Conex Transporter may be further sealed by passing a numbered railway car seal through a slot in the handle stop and looping it around the latch handle. The number of the car seal may then be entered on the appropriate waybill or bill of lading.
14. Conex Transporters can be loaded by fork-lift trucks, which can be used to place large packages or palletized lots *619 of goods inside tlie transporter, or men can walk into the transporter, carrying in the items to be stowed and skipped in it. Originally, Cones Transporters were designed for tke transportation of household goods, but all types of commercial items of freight, as well as mail, military supplies, troop baggage, and impedimenta, can be shipped in them. Boses and packages, both large and small, are regularly loaded and shipped in them, as are household goods, including pianos and other large items.
•15. Heavy and bulky items are preferably placed in Cones Transporters first, followed by lighter and less bulky items. Cargo may be stowed loosely and cross-tiered to gain masi-mum utility from the interior space. The weight, bulk, and construction of Cones Transporters require 'that, they be handled, stored, and transported “top-side-up.” This permits filling them with a minimum of bracing and dunnage. Horizontal steel bands, welded to the interior side and rear panels, provide means for lashing cargo.
16. Cones Transporters are weatherproof but not waterproof. Their computed liquid capacity is somewhat more than 2,000 gallons, but they cannot be used to transport liquids unless the liquid is packaged in another container.

Development and Use of Oonex Transporters Toy the Defendant

17. The Cones Transporter was developed from a shipping container originally designed for shipment of household goods and at first called “Transporter, Household Goods, shipboard.” These, like the Cones Transporter, were rigid, steel, reusable containers capable of carrying 9,000 pounds in 295 cubic feet. Apparently they were first used about 1949 and were almost identical with the present Cones Transporters.
18. Once the military design was fised, 67 transporters were procured for service testing. In early 1950, these new transporters, together with 33 units of a commercial design and some earlier models, were placed in service on a test basis for shipments to and from various overseas theaters. The tests continued into the period of the Korean conflict. *620 Additional transporters were procured for use witbin the Far East Command. Reports covering the period Jup.e-December 1951 established the transporter’s value in preventing pilferage and damage.
19. During the first half of 1952, a van express service (Vanex) was conducted between points in the continental United States and the Far East ports of Yokohama and Pusan. In this service, commercial semitrailers (called “Vans”) were loaded with priority cargoes, sealed, hauled to port, lifted aboard ship, and deck loaded. The Vanex service proved to be more costly than conventional methods of land-sea shipment. The vans used were heavy in relation to the weight of their contents. This increased stevedoring costs. Moreover, their great weight and large dimensions required the use of special handling gear and heavy-lift equipment at both the loading and discharge points.
20. “Conex” is a code word meaning “container express service.” Conex service, as such, was begun on a trial basis November 20, 1952, using 80 transporters diverted from household goods service. At about that time, the household goods transporter was reclassified as a standard type for the transport of military and quasi-military supplies and equipment susceptible to damage and pilferage. The descriptive term “Transporter, Household Goods, Shipboard” was changed to “Container, Shipping, Reusable, Steel, Capacity 295 cubic feet, Maximum load 8,000 pounds.” In 1953, the maximum load was increased to 9,000 pounds, and later, the designation “Container” was changed to “Box.” The term generally used to describe these articles, however, has been “transporter.”
21. At the end of fiscal year 1953, 172 transporters were in service. Of these, 41 were engaged in household goods lifts. The rest were being used exclusively for -repetitive round-trip shipments between depots on tight, fixed schedules. Beginning in the summer of 1953, steps were taken to expand the program. 2,600 transporters were available by the spring of 1954. Procurement of 10,000 additional transporters was approved for purchase during fiscal 1955. By early 1957, approximately 22,000 transporters were in worldwide service and, since that time, the number of trans *621 porters in use has been increased to approximately 65,000. As the program expanded, the use of Conex Transporters for the movement of household goods continued, along with their increasing use for shipment of other types of cargo.
22. The life expectancy of a Conex Transporter in normal use is 10 years. The average round-trip is 14 weeks. Conex Transporters may be used for temporary warehouses when the consignee is unable to use the contents immediately and no other covered storage is available. Such use for temporary storage may not exceed 60 days without specific approval.
23. Each of the approximately 65,000 Conex Transporters being used by the military services has a serial number which is stenciled on four sides. The transporters are operated as a single, composite, centrally-controlled fleet by the Joint Conex Control Agency, located in Washington, D.C., and functioning under the jurisdiction of the Chief of Transportation, Department of the Army. The Army and the Air Force have each contributed transporters to the Conex fleet. They are equally available for Army or Air Force shipments. The Control maintains a comprehensive system of reporting and recording the lading, current location, and destination of each Conex Transporter. The resultant records reflect the volume, speed, and description of Conex Transporter traffic. Thus, a simplified property accountability for the Conex Transporters is maintained. The system permits supervision of their utilization. It facilitates planning of timely and economical placement of transporters for loading, where and when they are required, and minimizes cross-hauls of empty transporters and accumulations of idle transporters. Consolidation and distribution of shipments in Conex service is via make-bulk points and break-bulk points. Control of the transporters is generally similar to that employed by the railroads in their operation of railroad cars.

Proceedings Leading to the Nem Glassification Efectivo May 10, 1957

24. Beginning in 1954, the Army sought a special classification applicable specifically to Conex Transporters. Such *622 a classification was established and became effective May 10, 1957. The proceedings leading to its adoption are summarized in findings 25, 26, and 27.
25. (a) On September 27,1954, the Army wrote the Classification Committees of the several classification territories requesting that the following new item be added to the classification:
CONTAINERS, Iron or Steel, Commodity Shipping, not less than 1496 gallons or 200 cubic feet capacity, for use in shipping Government Freight, S.U.
CFC No. 20-1/10, OOOR/77%
TIFC No. 2 100/10,OOOR/771/2
Illustrations and a description of the cargo transporters were presented at a public hearing, and it was explained that the requested rating of class 77% for carload minimum weight of 10,000 pounds would produce revenue comparable to that produced by the class 55 rating for 14,000 pounds minimum weight provided for containers under Item 18785 of the Classification.
(b) On December 27, 1954, the Official Classification Committee informed the Army that:
***the supporting documents disclosed that the article actually is a lift van and is now covered by item 9585 of the Classification. * * *
It is the opinion of the Classification Committees that there is no need for a specific entry inasmuch as item 9585 now is applicable, which ratings are deemed to be reasonable for this type of container, so this proposal was NOT RECOMMENDED.
26. (a) On January 13, 1956, the Eastern Weighing and Inspection Bureau informed the Official Classification Committee that despite the ruling described in finding 25, the Army was describing shipments of Conex Transporters as “Containers, Steel, SU, Viz Boxes, NOIBN.,” and asked the Committee to take appropriate action to have the proper description placed on future shipments.
(b) On January 18, 1956, the Committee asked the Army to take corrective action and to advise the Committee when such action had been taken.
*623 (c) On February 20, 1956, the Army replied, stating objections to the proposal that the articles be described as lift vans, principally on the ground that Item 9585 is designed to cover a furniture shipping container. The Army’s letter refers to dictionary definitions that describe a van as “a * * * vehicle for removing household goods, transporting furniture, conveying wild animals, or other like purposes.”
The Army’s letter suggested that “further thought be given to establishing a specific item with ratings that fall within the scope of the Metal Containers Case.”
(d) On February 24,1956, the Committee replied, expressing the view that household goods were merely one of the many commodities that may be transported in lift vans, as the Committee interprets that term, and pointing out that the Army had made no objection to or request for reconsideration of the Committee’s opinion of December 27,1954. The Committee’s reply concluded with
(i) a suggestion that if the Army wished to have its proposal reconsidered, it file a new proposal seeking reconsideration, and
(ii) a request that meanwhile the Army describe shipments of Conex Cargo Transporters as lift vans, in accordance with Item 9585 of the Classification.
(e) On March 30, 1956, the Army requested that the following new item be added to the Classification:
CONTAINERS, Iron or Steel, commodity shipping, not less than 1496 gallons or 200 cubic feet capacity, for use in shipping Government freight, S.U.
100/10,000R/771/2
A statement was submitted on behalf of the Army, which described the Conex Transporter and the Conex operation in considerable detail, and mentioned an increasing interest in industrial containers.
(f) On August 28, 1956, the Classification Committees recommended that the following new item be added to Classification 3:
CARRIERS, SHIPPING:
Containers, commodity shipping, steel, capacity 135 cubic feet or over, SU, loose or in packages.
150 10,000R 85
*624 Tlie Committees’ recommendation stated:
* * :l; *
Our opinion is that these commodity shipping containers are, in fact, lift vans and their transportation characteristics justify no lower ratings than are accorded lift vans. We, therefore, recommend, primarily for Classification purposes, that a specific entry be established as shown above.
27. (a) On August 31, 1956, the Army requested that its prior request, described in finding 26, be withdrawn in order that an amended proposal, based on factors not previously submitted, might be considered.
(b) The Committees withheld publication of the new entry and heard additional evidence in support of the following new item proposed by the Army:
ITEM 13785 — CONTAINERS, SHEET IRON OR STEEL
Boxes, Shipping, for miscellaneous cargo packed according to tariff requirements.
The Army’s presentation predicted the use of various sizes of containers, some of which would not be covered by the proposed new classification description that had been recommended by the Committees, and suggested, as an alternative, the description quoted immediately above.
(c) On February 12, 1957, the Classification Committees recommended, instead, the addition of the following new entry under the general heading of Containers, Sheet Iron or Steel, but at ratings of 150 LCL and 85 CL-10,000R:
CONTAINERS, SHEET IRON OR STEEL, SET UP (WITH OR WITHOUT THEIR EQUIPMENT OF BAILS, HANDLES, COVERS, BUNGS OR NOZZLES), * * *
Containers, commodity shipping, capacity 135 cubic feet or over, SU, loose or in packages.
150 10,000R 85
The 85 percent rate recommended for carload lots was the same as that on lift vans.
*625 Persisting in their previous position that the containers covered by the new entry had been adequately described as “vans, lift or other than lift,” the Committees recommended that “noibn” be added to Item 9585 in order plainly to exclude the particular kind of “van” to which, in the Committees’ view, the new classification would apply thereafter.
28. This new item became effective May 10, 1957, and has been accepted as covering Conex Transporters since that time, although the rate later was reduced from 85 percent of the first-class rate for carload lots to 55 percent (the same rate the defendant here claims was applicable to the 1956 and 1957 shipments that gave rise to the charges in question in this case). The reduction of the rate was made on application of Dravo Corporation, which makes an article similar to the Conex Transporter called the Transportainer.

History of the Lift Van Itemin the Glassification

29. The .lift van item in the Classification originated and developed initially as a description of equipment used for moving household goods.
SO. In September 1902, the Bowling Green Storage and Van Co. inquired of the Western Classification Committee about the classification applicable to household effects and secondhand furniture carried in lift vans. The inquiry described the lift vans referred to as moving van bodies without running gear, made out of wood specially selected for protection against dampness, and covered with thin sheet steel. These vans were 16 feet long, 3 feet wide, 7 feet 8 inches high, and weighed 3,000 to 3,750 pounds.
31. Under “vehicles,” classifications applicable to “vans, moving, empty, without running gear” appeared in 1902 and 1904.
32. Effective July 1,1906, the following item appeared in Official Classification No. 22:
Vehicles, not self-propelling:
Vans:
Moving, with or without running gear, min, weight 6,000 lbs. each (C.L., min, weight 10,000 lbs.) (subject to Rule 27).
*626 Variants of tbis form appeared under “Vehicles, not self-propelling” in 1907, 1910, and 1913.
33. On February 1, 1917, the term “lift van” first appeared in Official Classification No. 44 as:
CARRIERS:
Lift Vans:
Loose
Loose, C.L., min. wt. 10,000 lbs. (subject to
Rule 27).
Variants of this item, including Item 9585 quoted in finding 3, appeared under “Carriers” and “Carriers, Shipping” between 1917 and 1957 when, as indicated in finding 27, “noibn” was added.

Application of the Lift Van Glassification

34. On numerous occasions between 1917 and May 10,1957, the Classification Committees expressed the view that various items of cargo transporting equipment, the size and detailed construction of which varied considerably, should be rated as lift vans. Early types so treated usually were demountable truck bodies, considerably larger than the Conex Transporter. Later, other forms were developed, some large, some about the size of the Conex Transporter. Some could be folded or knocked down for more convenient transportation when empty. Others were rigid and similar in general form and construction, as well as in size, to the Conex Transporter. Consistently, the Committees regarded them as “vans, lift or other than lift.”
Most were used primarily for the transportation of household goods, but in later years, reusable containers, similar in size and construction to the Conex Transporter, proposed to be used for transporting cigarettes and other types of cargo, were also rated as lift vans.
When early forms of the Conex Transporter were developed, originally for transporting household goods, they too were regarded by the Committees as lift vans and, even after such equipment came to be used for transporting various types of cargo other than household goods, the Classification Committees persisted in the view that they were properly to be regarded as lift vans.
*627 As indicated in finding 27, when, in May 1957, the Classification Committees recommended a special classification to eliminate the controversy that had arisen as a result of the Army’s persistent disagreement with the Committees’ view that the Conex Transporter was a lift van, “noibn” was added to the lift van item to make clear that, in the view of the Committees, the new category was a lift van, and that the old category was limited thereafter to those lift vans not covered by the new one.
Thus it appears that the Committees have never deviated from their position that Conex Transporters are lift vans. This position was repeatedly asserted to Army officials.
35. In the Army’s opinion, however, “One of the principal obstacles to the attainment of optimum economy and efficiency in the CONEX service was that of securing reasonable rates covering mixtures of commodities loaded in transporters, and a suitable rate applicable to empty returned transporters.” [4] Accordingly, as described in findings 24 through 28, it sought a special classification applicable to them at a rate lower than the lift van rate. Meanwhile, it insisted that the Conex Transporter was not a lift van, but should be classified as a sheet iron or steel box, noibn, under Item 13785, which carried a lower rate than lift vans. Its instructions to its representatives to so rate Conex Transporters in bills of lading, and the countervailing efforts of the railroads to require adherence to the lift van classification, created numerous problems of the sort which are the subject of the controversy involved in this case.

Prior Official Actions Ooncerning the Classification Applicable to Conex Transporters

Eaton Metal Products Company Case

36. (a) In January 1956, the Army issued an invitation to bid for “21,127 metal shipping boxes, reusable (transporter).” Bidders were requested to quote unit and total prices, on specified lots, based on f.o.b. common carrier’s equipment at the contractor’s plant, and were told the bids *628 would be evaluated on the basis of the lowest cost to the Government of 11,127 boxes delivered to the New Cumberland General Depot, New Cumberland, Pennsylvania and 10,000 boxes delivered to the Utah General Depot, Ogden, Utah. This method of evaluating the bids was adopted because definite destinations of the boxes were not known at the time bids were requested.
(b) 29 bids were received. The entire quantity of 21,127 boxes was awarded to Jeta Metal Fabricators, Inc., Yonkers, New York.
(c) In March 1956, Eaton Metal Products Company of Denver, Colorado, one of the 28 unsuccessful bidders, protested the award. Eaton claimed the Army was wrong in evaluating the aggregate cost to the Government under the bids on the basis of rates applicable to “Containers, Sheet Iron or Steel, Set Up,” and claimed that they should have been evaluated, instead, on the basis of rates applicable to “Vans, lift or other than lift.”
In support of its position, Eaton referred to prior action of the Classification Committees and to an informal opinion, dated May 21,1956, by the Director of the Bureau of Kates, Tariffs, and Informal Cases, of the Interstate Commerce Commission.
(d) On July 17, 1956, the Comptroller General rejected the Eaton protest. The Comptroller General’s letter said that the Army was then negotiating with the Classification Committees for publication of a classification to cover the Conex Transporter specifically,[5] and concluded that, in evaluating the contract, the Army was not precluded from applying the rate on the box classification.
The Comptroller General’s reply further stated that the informal ICC opinion of May 21, 1956, merely expressed the views of the Director of the Bureau, without prejudice to any different conclusions the Commission might reach *629 in a formal proceeding, and that the opinion itself bad pointed out that the conclusions expressed were not binding upon the carriers or shippers.
The ultimate effect of this decision was not a formal determination by the General Accounting Office that the box classification used by the Army in evaluating the bids was necessarily correct. It held merely that in determining comparative delivered costs under bids, Government contracting officials need do no more than exercise their best judgment in evaluating the rates, that the evaluation had been made in good faith in the honest belief that it was proper, and that the record made on Eaton’s submission did not establish that it was improper. The Comptroller General accordingly concluded that he would not be justified in holding that the award, as made, did not constitute a legally binding contract.
(e) On July 31,1956, Eaton sought reconsideration of this decision through a detailed and comprehensive petition.
(f) On September 14, 1956, the Comptroller General reiterated its previous holding on grounds substantially the same as those stated in its letter of July 17,1956.
The record does not indicate that Eaton pursued the matter further.

Tennessee Central Case

37. (a) In November 1957, after audit by the General Accounting Office, amounts by which payments that had been made to the Tennessee Central Railway for transportation of Conex Transporters on the basis of the lift van classification exceeded those that would have been due under the “box noibn” classification were deducted from amounts otherwise due to Tennessee Central.
(b) Tennessee Central protested the deductions and referred to an informal opinion, dated November 22, 1957, given in response to an inquiry made of the Chief of the Section of Informal Cases, Bureau of Traffic, Interstate Commerce Commission, which stated that the “lift van” rating was applicable to shipments moving before May 10, 1957, and the new “container” classification was applicable thereafter. Tennessee Central submitted this opinion to *630 the Comptroller General on December 9, 1957, requesting review of the cutbacks, and citing various 1955 expressions of the Southern Weighing and Inspection Bureau (an expert railroad agency charged with checking for proper ratings and charges on shipments), as well as expressions by the ICC and the Classification Committees.
(c) On July 3, 1958, the Comptroller General rejected Tennessee Central’s claim. The opinion stated that “* * * it has been said that a proper test of the applicability of a rate is whether the article may be reasonably identified by the tariff description under which the rate is assessed.” It described the term “lift van” as peculiar to the household goods industry and concluded that the record did not contain convincing proof that the containers were, in fact, lift vans. The rejection relies heavily on the assertion that in seeking refund of the deductions the carrier had the burden of proving that Conex Transporters were lift vans, and had not sustained that burden.

The Weyerhaeuser Petition

38. (a) In June 1958, Weyerhaeuser Steamship Company filed a petition with the Interstate Commerce Commission seeking a declaratory order with respect to rates applicable on cargo transporters that had been described on the bills of lading as “carriers, shipping van, lift or other than lift, SU.” According to the petition, the General Accounting Office had presented a claim, in April 1957, for overpayment on a shipment of cargo transporters moved January 31,1954. Its claim was based on the ground that cargo transporters should be rated as “sheet iron or steel containers, liquid capacity exceeding 15 gallons.” The carrier rejected the claim, cutbacks were made, and $4,130.09 was deducted from amounts otherwise due Weyerhaeuser.
(b) On August 8, 1958, the General Accounting Office replied, opposing Weyerhaeuser’s petition on procedural grounds going to the Commission’s jurisdiction. The reply admits the facts, and indicates that the tariff issue, as it was considered by the General Accounting Office, was similar to the issue here, although Weyerhaeuser is a steamship company rattier than a railroad.
*631 (c) On August 12, 1958, the Interstate Commerce Commission rejected Weyerhaeuser’s petition as beyond its jurisdiction.
(d) On October 81, 1958, GAO sent a further letter to Weyerhaeuser referring to the ICC action dismissing the petition. Befund of the deductions was refused. This record does not indicate whether Weyerhaeuser attempted to pursue the matter further.

Ocmmeroial Usage of the Term “Van”

.39. The record contains numerous published illustrations and descriptions of items of reusable transportation equipment, referred to as “vans.” These include both large and small truck and trailer bodies, permanently attached to the vehicle. They include removable truck and trailer bodies of various sizes, materials, and details of construction. They include, in addition, a substantial number of rectangular bos-like cargo containers, devoid of independent means of locomotion, that are not themselves a part of any vehicle, but are adapted to be loaded indiscriminately onto trucks, trailers, railroad cars, ships, or other means of transport. Some of these latter can be folded for economical transportation empty. Some cannot. All are reusable. The materials of which they are made vary, as do the details of their construction. Some have smooth exteriors and beams or rails inside. Some are smooth inside and have stiffening structures outside. Some have skids underneath. Some have eyes or other means for lifting them from above. There are other variations in details of their structure. Some are very large and some appear to be about the same size as the Conex Transporter. All appear to be adapted to the transportation, not only of household goods but of any other cargo that can be placed inside them. All are generally rectangular, box-like containers bearing a rough general resemblance to the body or “van” of a truck. It seems quite clear from the record that such containers generally are well and widely known as vans. Those that have no wheels, rollers, or other means of being moved about other than means adapted to facilitate lifting them onto or off of separate means of trans *632 port, or handling them by fork-lift trucks or other handling equipment, are commonly called “lift vans.”

Expert Testimony

40. (a) Plaintiff presented, as an expert witness, the President of Security Storage Company of Washington, D.C. That company, for about 50 years, has used, in its business of moving household goods, equipment of different sizes having physical characteristics generally similar to those of the Conex Transporter. Some of this equipment is all steel, some is made of aluminum, and some has walls made of double thicknesses of wood. Some is almost identical in size to the Conex Transporter and some is larger.
(b) For many years, Security Storage has referred to equipment of this type as a lift van, regardless of the size of the individual unit or the material of which it is made. The service provided by Security Storage through its use of such equipment has been widely advertised and otherwise publicized as lift van service. It now has a large fleet of what it calls “lift vans” in worldwide service.
(c) This witness testified that the term lift van has been used in the United States since 1900 and has been a generally recognized term for 35 years.
(d) He also testified that lift vans are used for transporting general freight, as well as for household goods.
(e) This witness was well acquainted with Conex Transporters, as well as with the Dravo Transportainer, and with generally similar equipment of Container Transport International, which is also advertised as a lift van. He testified that representatives of the Government had consulted Security Storage in 1946 and 1947 in connection with the development of Conex Transporters, had had specifications and blueprints of Security Storage lift vans, and had studied the entire Security Storage lift van operation.
He expressed the opinion that the Conex Transporter is a lift van.
(f) Security Storage containers were rated as lift vans by the Classification Committees in 1929.
*633 41. A member of the Official Classification Committee in New York testified for the plaintiff. Tbis committee is the railroads’ group of experts designated to maintain, publish, and interpret the Freight Classification Tariffs. He had made a detailed study of the files of the Classification Committee and those of the Eastern Weighing and Inspection Bureau. He had visited the manufacturing plant of Jeta Metal Fabricators and was acquainted with Conex Transporters. tie reaffirmed the opinion, which the Committees have consistently maintained, that before May 10, 1957, Conex Transporters were properly ratable as lift vans and not as boxes noibn.
42. A classification specialist of the Interstate Commerce Commission, testifying under subpoena by the defendant, testified to giving an informal opinion in April 1960, to a motor carrier, that Conex Transporters were not lift vans within the meaning of a motor carrier tariff. Specifically the opinion states in part:
* * * A search reveals no advertisements or discussions of such containers in which they are called “vans”, let alone “lift vans”. The question * * * turns on the general, commercial understanding of the meanings of the terms “van” and “lift van”. From the information available, it appears that “Conex” containers are not now and since 1956 have not been known generally and commercially as “vans” or “lift vans”, * * *
This situation emphasizes the urgent need for explicit, unambiguous commodity descriptions in tariffs. Though the rule is sound that when construing classifications and other tariffs .the descriptive terms used must be given their customary commercial significance, too few tariff users are well informed as to the significance of terminology ordinarily employed in the widely divergent businesses of shippers who use common carriers, and multitudes of claims (overcharge and undercharge) are bound to result when an ambiguous term like “lift vans” is published. From a dictionary point of view, a “van” is a covered truck or wagon for moving furniture, or the body of such a vehicle; and if the carriers meant and still mean something substantially different from that — ■ and something not commonly and widely understood in the trade — the difference should have been and should now be spelled out in explicit terms. * * *
*634 The testimony of this witness, on cross-examination, indicates that in preparing this opinion he had not made very extensive specific research into the relationship between the form of Conex containers and other cargo transporters, or into prior opinions of officials of the Interstate Commerce Commission, or into facts concerning lift vans that might be available in the files of that Commission.
43. Defendant presented, as an expert witness, a retired official of the Interstate Commerce Commission who for many years had been a classification specialist in the Bureau of Traffic and later was Director of that Bureau. He expressed the opinion that the Conex Transporter, when intended for use in transporting cargo other than household goods, should be rated as a box and not as a lift van, although it might properly be rated as a lift van if intended for transportation of household goods.
This opinion appeared to be based on an analysis stated by the witness that may be summarized as follows:
(a) The classification for sheet metal boxes noibn means all sheet metal boxes except those more specifically described and rated in some other item of the classification.
(b) The classification is a tariff, the function of which is to describe accurately each service the railroad offers to the public and to state its price.
(c) The tariff is addressed to all prospective shippers and must be in terms that are intelligible to the average intelligent shipper. All doubts and ambiguities must be resolved against the railroad and in favor of the shipper who is trying to use it.
(d) If the railroads are to prevail, they must show beyond a reasonable doubt that the Conex Transporters are vans.
(e) As long as only household goods shippers used containers of this type, there was no problem. They understood these containers were vans and paid the rates for vans.
(f) In more recent years, others commenced using such containers to cut the cost of handling small shipments and to reduce pilferage. According to the witness, such containers were not known to such people as vans, and so, when the Government’s representatives looked through the classifications in search of the proper *635 classification, for their Conex Transporters, they found nothing with which they could identify the Conex Transporters except the description for sheet iron boxes noibn. In the opinion of this witness, if they saw the van rating, they would probably think, as the witness does, that a van, as distinguished from a van-type vehicle, is the dismounted body of such a vehicle.
(g) According to the witness, those who ship household goods are but a small segment of the shipping public, and it seems wrong to him to charge the Government, and other shippers of package cargo, with knowledge that containers of this kind were known as vans in a relatively small business, wholly foreign to their business.
(h) The witness concludes, accordingly, that when these containers are shipped by or to household goods people, they are vans, known as such and subject to the van rate — but that the Government and other people who propose to use them for transporting miscellaneous package cargo know them only as boxes and thus are entitled to the rate for boxes — that, in order to apply, the classification must be clear and unambiguous to the shipper, and that it would never occur to such persons that Conex Transporters are vans.
(i) In the opinion of this witness, the height, width, size, weight, and construction of containers of this general type are not significant factors — no matter how large or small they are, when they are shipped by or to persons who propose to use them for cargo other than household goods, they are, in his opinion, properly ratable as boxes noibn — otherwise they are vans.

Ultimate Findings

44. Before 1954, equipment for transporting household goods, similar in all essential respects to the Conex Transporter, was well and widely known as a lift van among persons engaged in the business of transporting household goods.
45. Cargo transporters, similar in all essential respects to the Conex Transporter, were first developed and used by the Government for transporting household goods.
46. The Government’s development of the Conex Transporter and the Conex program was based on careful and thorough study of problems connected with the transporta *636 tion of household goods and other types of cargo hi reusable containers, and persons concerned with development of the program and the transporters believed that the classification and rates applicable to transporters were a major factor affecting the achievement of an efficient program. It is a reasonable inference that they were well acquainted with their business and with the classifications and rates applicable to the equipment used in it.
47. This record affords no substantial basis for concluding that Government employees engaged in the development and use of cargo transporters for the transportation of household goods were unaware that such cargo transporters were commonly known as lift vans among persons concerned with their use for that purpose, and that the lift van classification was commonly regarded as applying to such equipment. The reasonable inference from the whole record is to the contrary.
48. This record affords no substantial basis for concluding that to persons engaged in the business of transporting household goods in cargo transporters, including Government employees so engaged, the lift van classification, stated in Item 9585, did not plainly include within its description, prior to May 10, 1957, Conex Transporters proposed to be used for transporting household goods. The reasonable inference from the whole record is to the contrary.
49. This record affords no substantial basis for concluding that Government employees concerned with extending the Government’s use of Conex Transporters from the transportation of household goods to the concurrent transportation also of other types of cargo were unaware that similar equipment, when used to transport household goods, was commonly known as a lift van and that the lift van description in the Uniform Freight Classification was commonly regarded as applicable to such equipment so used. The reasonable inference from the whole record is to the contrary.
50. Conex Transporters, used by the Government for transporting cargoes other than household goods, did not differ from Conex Transporters used by the Government for transporting household goods.
*637 51. This record affords no substantial basis for concluding that, to Government personnel engaged in extending the use of Conex Transporters to transportation of cargo other than household goods, in addition to and concurrently with their continued use for transporting household goods, the lift van classification, stated in Item 9585, did not plainly include within its description, prior to May 10, 1957, Conex Transporters proposed to be used for transporting cargo other than household goods, as well as those proposed to be used for transporting household goods. The reasonable inference from the whole record is to the contrary.
52. Before May 10, 1957, a shipment of Conex Transporters, by or to the Government, was properly ratable as a lift van under Item 9585 of Uniform Freight Classification No. 3.
53. Before May 10, 1957, a shipment of Conex Transporters, by or to the Government, was not properly ratable as a box noibn under Items 13785, 13790, and 13815 of Uniform Freight Classification No. 3.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States the sum of sixteen thousand three hundred ninety dollars and one cent ($16,390.01).

 Hereafter described in more detail and referred to throughout these findings as “Conex Transporters.”

 “SU” means set up. “KD” means knocked down.

 Note 1, Item 13830, is as follows: “The liquid capacities mentioned herein refer to those commonly known as commercial capacities.”

 See page 17 of “Cones — A Milestone in unitization,” a report of the Office of the Chief of Transportation, Department of the Army, March 1957, which appears in the record as plaintiff’s exhibit 1.

 This evidently referred to the proposal, submitted March 30, 1956, based on a rate of IT1/?, percent of the first-class rate, ■which is described in finding 20(e). The Comptroller General’s letter goes on to say that the Army reports that if the Classification Committee does not act favorably on the pending proposal, the matter of the proper interpretation of the classification and the reasonableness of the resulting rates will be referred to the Interstate Commerce Commission. This was never done.